IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH BROWN,

    Petitioner,                                               No. CIV S-09-1321 GEB CHS

    vs.

KATHLEEN DICKINSON,

    Respondent.                FINDINGS AND RECOMMENDATIONS

/

## I. INTRODUCTION

        Petitioner Brown, a state prisoner, proceeds pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner stands convicted of attempted willful, deliberate, and premeditated murder and assault with a deadly weapon in the Solano County Superior Court, case number VCR174764, for which he is currently serving an indeterminate prison term of 23 years to life.

## II. BACKGROUND[1]

        The victim, Sandeep Sharma, worked at the Bonfare Market in Vallejo. On August 14, 2004, just after 6:00 a.m., petitioner entered the Bonfare Market along with a man in

---

[1] *See People v. Brown*, No. L 2516459, 2008 WL 2516459, at 1-2 (Cal. App. 1 Dist., 2008).

1

a wheelchair.  Sharma was alone in the store.  He recognized petitioner and the other man as prior customers.

Sharma was at the cash register in the front of the store.  Petitioner and the other man went to the refrigerated coolers in the back of the store.  The man in the wheelchair asked Sharma about "the Arizona grape drink."  Sharma told him he didn't carry it, but did carry "the Mystic grape drink," which was kept in the cooler at the left corner of the back of the store.  The man in the wheelchair said he couldn't find the Mystic grape drink and asked Sharma to help him.  Sharma walked towards the left rear corner of the store, passing petitioner who was standing at the center of the rear wall of coolers.  Petitioner "was just standing there looking towards the refrigeration area, towards the coolers."  Petitioner had not said anything to Sharma.

After Sharma passed petitioner, he opened the refrigerator door to retrieve the Mystic grape drink. Then petitioner grabbed him from behind and stabbed him on the right flank, above his right hip and towards his back.  Sharma felt a sharp pain.  Sharma fell to the ground and petitioner fell on top of him.  Petitioner grabbed Sharma and the two men wrestled.  Sharma was trying to push petitioner away because he was afraid petitioner would stab him again. While they wrestled, petitioner demanded the store's surveillance tape in a loud aggressive voice.

Petitioner got up and moved to the right rear of the store.  Sharma got up. Petitioner ran toward him.  Sharma ran to the front of the store and fell on the Pepsi display. Petitioner came to within two feet of Sharma with a knife in his hand.  A customer who had just entered the store told petitioner to stop.  Petitioner did not try to stab Sharma again.

Petitioner walked out of the store.  So did Sharma.  The man in the wheelchair told Sharma he would call 911.[2]  Sharma stood outside with petitioner for one to two minutes, during which petitioner did not say anything to Sharma or try to threaten, stab or otherwise attack him. Petitioner stood quietly.  Sharma went back inside the store.  Petitioner walked away.

---

[2] Police later determined that the man in the wheelchair was not involved in the crime.

1    At trial, the store surveillance tape was played for the jury, and accurately
2 depicted the events described by Sharma.
3    On cross-examination, Sharma testified he had seen petitioner in the store before,
4 but had never had any problems with him. He also testified that petitioner did not punch him or
5 strike him, and never threatened to kill him.
6    Sharma's knife wound was about three inches deep, and required surgery and
7 stitches. It was just two inches from the aorta and the vena cava. As a result of the wound,
8 Sharma cannot stand for a long time, and feels "numbness and pain and pressure in [the] area."
9    A Vallejo police detective arrested petitioner, without incident, in Fairfield on
10 August 17, 2004.  After being told his *Miranda* rights, petitioner agreed to make a statement.
11 Petitioner said he entered the Bonfare Market in the early morning of August 14, 2004, "tripped
12 out," and stabbed the victim.  He used a fixed-blade knife about four-to-six inches long.
13    Petitioner told the detective that he had a dispute with Sharma over change from a
14 purchase about a week before the stabbing.  He initially said the dispute was the reason for the
15 stabbing, but "[u]ltimately he explained that he had no reason for the stabbing; that he just
16 tripped out, or blanked out."  Petitioner did not tell the detective that he wanted or intended to
17 kill Sharma.
18    Petitioner also told the detective he had driven to the store and parked about a
19 quarter-mile away.  He did not say why he parked so far from the store.  He said he threw his
20 knife in a swamp after he left the market, while walking to his car.
21    Petitioner did not testify or call any witnesses.  In closing argument to the jury,
22 defense counsel conceded that defendant assaulted Sharma with a knife, but argued that
23 defendant did not intend to kill him and should not be convicted of attempted murder.
24    A jury convicted petitioner of attempted willful, deliberate, and premeditated
25 murder and assault with a deadly weapon or by any means likely to produce great bodily injury.
26 On appeal, petitioner claimed instructional error and ineffective assistance of counsel.  The latter

3

claim was pursued in a habeas corpus petition, presenting facts outside the record. The California Court of Appeal, First District, affirmed the judgment and sentence. A petition for review to the California Supreme Court was denied. Petitioner sought habeas corpus relief in state court which was likewise denied.

### III.  GROUNDS FOR RELIEF

The petition presents two grounds for relief:

Ground One: Trial Counsel rendered ineffective assistance of counsel by failing to present evidence that petitioner had a mental disorder rendering him incapable of forming the intent to kill;

Ground Two: The trial court erred in violation of due process when it rejected the defense's proposed modified version of pattern jury instruction CALJIC No. 8.66 on the elements of attempted murder.

### IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

This court looks to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919. The state court's factual findings are presumed correct if they are not rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Taylor v. Maddox*, 336 F.3d 992, 1000 (9th Cir. 2004). It is the habeas corpus petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law. *Woodford v. Visciotti*, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).

## V.  DISCUSSION

### A.  Ground One: Ineffective Assistance of Counsel

Petitioner claims that he was denied his Sixth Amendment right to the effective assistance of counsel when counsel did not present a defense based on mental disease, defect, or disorder which could have negated his ability to form the specific intent to kill, a necessary element of attempted murder, or demonstrated that he did not premeditate or deliberate the attempted murder.

Petitioner was represented by William Pendergast at trial.  Prior to Pendergast's appointment, Dr. Purna Datta, clinical psychologist, evaluated petitioner and generated an eight page report which was provided to the previous attorney of record.  (Clerk's Transcript on Appeal ("CT") at 274-281.)

In pertinent part, Dr. Datta's report indicated that petitioner claimed to have heard voices in his head since he was 13 years old and that he reported that he stabbed the victim because he "panicked and lost control of self."  (CT at 274.)  Petitioner also reported sleep problems and the use of methamphetamine and ecstasy when under stress.  It was noted that

5

petitioner's mother suffers from severe mental illness for which she had been hospitalized many times.  Dr. Datta noted that petitioner had been previously charged in 1994 with a similar offense that also appeared to be a robbery attempt and in both cases, he did not take any money from the store.  Dr. Datta concluded that petitioner's "report/claim of auditory hallucinations will need to be investigated further" and that petitioner should be further evaluated to decide "if he had been mentally insane at the time of the offense."  (CT at 280.)

Previous counsel obtained a second confidential psychological evaluation. Carlton Purviance, Ph.D., observed, in pertinent part:

> At those times when the defendant was not asked simple direct questions, he endeavored to steer the subject toward convincing me he was suffering from a major mental illness.  He spontaneously introduced a number of signs and symptoms he thought would indicate mental illness, and he volunteered that he: "Sees things and I have thoughts of people getting hurt... I do things at night and the next morning I wouldn't remember them... I kept telling people nothing was wrong with me but I knew there was.... As I am sitting here talking to you the voices are telling me to stop talking to you... The voices are telling me to say foul things... I have visions and I see things like death and people getting hurt... I don't know why I am seeing all this stuff... I've been seeing it for years..."
>
> The defendant pretended to have great difficulty answering the simplest of questions (e.g. How old is your sister?) While he encountered no difficulty whatsoever when asked to describe the symptoms of his (feigned) mental illness.  He was able to specify the exact drug and dose of his psychotropic medication at the jail: "Thorazine 200mg."  To the prescribing psychiatrist at the jail he reported that the Thorazine was benefitting him, yet to me he complained that his (alleged psychotic) symptoms were not helped by this drug...

(*See* Respondent's Exhibit E-1.)

Dr. Purviance noted that petitioner was high on methamphetamine when he committed this offense, and that he had been using the drug on a daily basis when he previously committed the similar offense against another store clerk.  Dr. Purviance concluded:

> The only pyschological issue that I am confident of here is the defendant's significant methamphetamine addiction.  In my opinion he is malingering a psychotic disorder, and he is not

> unfamiliar with the symptoms of paranoid schizophrenia since his mother has suffered from that disorder for "years"...
>
> With regard to psychiatric defense issues, even if the defendant was toxic and psychotic from the prolonged use of methamphetamine when he entered the store, there is the problem of his voluntary intoxication. Moreover, Mr. Brown's actions at the time (his interest in the surveillance tape, his flight from the scene, and his throwing away of the knife) all indicate the presence of mens rea or consciousness of guilt.

(*See* Respondent's Exhibit E-1.)

Pendergast was aware of and had reviewed both reports. In a letter to petitioner's appellate counsel, the contents of which were later sworn to be true by declaration which is also before this court, Pendergast wrote that he investigated the possibility of a defense of insanity or a defense to negate specific intent, but rejected it because of the voluntary intoxication issue and because of Dr. Purviance's report. Pendergast discussed these issues with petitioner and petitioner agreed to forego the defense.[3] Pendergast explained:

> Raising a mental defense presented a number of additional potential problems in this case. I was concerned that if we raised a mental defense it would allow the prosecution to rebut any such defense with charges of malingering or lying. Such information outweighed the potential benefits of a mental defense. Further, the prosecution sought to introduce evidence of Defendant's previous attempted murder which occurred at the very same convenience store about a decade earlier wherein he shot the clerk in the face with no provocation. I was able to exclude this evidence from trial. This other crimes evidence was nonetheless troubling for a variety of reasons. If we tried to raise a mental defense now it would beg the question as to why he did not raise a mental defense then, given his description of his disease's genesis to the various doctors in the present case. Raising a mental defense could require Mr. Brown to take the stand and/or otherwise open the door to allow the 1101(b) evidence sought by the Prosecution. The risk of Mr. Brown appearing to be a liar, or the potential introduction of the 1101(b) evidence of the prior attempted murder outweighed the potential benefit of raising a mental defense in this trial.
>
> There were other strategic reasons for this choice as well. The

---

[3] Petitioner has denied telling Pendergast that he did not want to present evidence of mental illness. *People v. Brown*, *supra*, at 7.

> facts, photographs, and videotape all supported my argument that Mr. Brown did not have the intent to kill because if he wished to kill the clerk, he had every opportunity to do so. This defense allowed me to argue the intent to kill issue without the dangers of raising a mental defense.

(*See* Respondent's Exhibit E-1.)

Relying on this evidence, the state appellate court rejected petitioner's claim of ineffective assistance of counsel, reasoning:

> Pendergast had one report suggesting that defendant *might* be mentally ill, and a second report stating in clear terms that its author believed defendant to be faking mental illness. Pendergast was concerned about introducing defendant's voluntary drug intoxication to the jury. Pendergast had obviously viewed the videotape (which we have not) and believed, as a tactical matter, that a better defense was the one he put forth: that the facts and circumstances did not show an intent to kill.
>
> Pendergast's tactical decisions were reasonably competent under the circumstances of this case. Given the facts of the assault and the Purviance report, we cannot say that it was unreasonable to cease further investigation of a mental defense or to fail to present evidence of mental illness at trial. Defendant has not made a prima facie case of ineffective counsel.

*People v. Brown*, *supra*, at 8.

To demonstrate a denial of the Sixth Amendment right to the effective assistance of counsel, a petitioner must establish that counsel's performance fell below an objective standard of reasonableness, and that he suffered prejudice from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Prejudice is found where there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*.

"Surmounting *Strickland's* high bar is never an easy task," and review under the AEDPA is doubly deferential. *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (citing *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)). The relevant question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard. *Harrington*, 131 S. Ct. at 788.

Under this standard, the claim fails. A reasonable argument certainly exists that Pendergast's decision was tactical, strategic, and well within the wide range of competent representation. Petitioner fails to overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation omitted). "It is [ ] an acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990). Strategic decisions are "virtually unchallengeable." *Id*. at 690; *see also Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997) ("Counsel knew about the evidence and looked into it, but chose as a tactical matter not to use it. A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*..."). No relief is available.

### B.   Ground Two: Instruction with CALJIC No. 8.66

The jury was instructed with CALJIC No. 8.66 on the elements of attempted murder. Petitioner claims that he was deprived of his constitutional rights to due process and a fair trial when the trial court declined to modify the instruction to emphasize that the element of intent to kill was not established merely by the fact that the victim was stabbed. Petitioner contends that this modification was necessary to focus the jury's attention on the defense theory of the case.

As given, CALJIC No. 8.66 instructed the jury:

> In order to prove attempted murder, each of the following elements must be proved:
>
> 1. A direct but ineffectual act was done by one person towards killing another human being; and
>
> 2. The person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being.
>
> In deciding whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the

> other. Mere preparation, which may consist of planning the killing or of devising, obtaining, or arranging the means for its commission, is not sufficient to constitute an attempt. However, acts of a person who intends to kill another person will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to kill. The acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design.

(CT at 216.) And further:

> In the crime charged in Count One, namely, ATTEMPTED MURDER, there must exist a union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless this specific intent exists the crime to which it relates is not committed.

(CT at 216.)

The defense's requested proposed addition would have instructed:

> Specific intent to kill unlawfully is a necessary element of attempted murder and the prosecution must prove beyond a reasonable doubt that the defendant harbored such a requisite intent. Intent to kill unlawfully can not be inferred solely from the commission of another dangerous crime such as assault with a deadly weapon with the intent to cause great bodily injury in violation of Penal Code section 245(a)(1). In addition to proving that the defendant committed assault with a deadly weapon with the intent to cause great bodily injury in violation of Penal Code section 245(a)(1) the Prosecution must present other independent evidence which, directly or by solid inference, proves beyond a reasonable doubt that defendant intended to kill.

(CT at 186.)

On direct review, the California Court of Appeal rejected the claim of error, concluding that "the requested pinpoint instruction was duplicative of the other instructions on the elements of the charged offenses..." *People v. Brown*, *supra*, at 3.

Petitioner's claim of instructional error does not raise a cognizable federal claim unless the error, considered in context of all the instructions and the trial record as a whole, "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991); *see also Henderson v. Kibbe,* 431 U.S. 145, 152-55, n.10 (1977);

*Cupp v. Nauhten,* 414 U.S. 141, 146-47 (1973). In addition, on federal habeas corpus review, no relief can be granted without a showing that the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Petitioner fails to meet this standard. The trial court's rejection of the requested additional instruction did not render his trial fundamentally unfair in violation of due process. The concept of the additional instruction was already covered by the standard instructions on the elements of the offense and the requirement that each element be proved beyond a reasonable doubt. Due process does not require the trial court to instruct on the defendant's precise theory of the case where other instructions adequately cover the defense theory. *See Duckett v. Godinez*, 67 F.3d 734, 743-46 (9th Cir. 1995) (no relief for failure to give instruction on alibi defense). Petitioner is not entitled to relief.

## VI.  CONCLUSION

For all the foregoing reasons, IT IS HEREBY RECOMMENDED that the application for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 18, 2011

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE